**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

**CRIMINAL NO. 15-20378**

**HON. BERNARD A. FRIEDMAN,**

**STEVEN MINELLA,**
            **Defendant.**

_____/

**SENTENCING MEMORANDUM OF THE UNITED STATES**
**AS TO DEFENDANT STEVEN MINELLA**

The United States of America, by and through its attorneys, Matthew

Schneider, United States Attorney for the Eastern District of Michigan, and David

A. Gardey and Dawn N. Ison, Assistant United States Attorneys, respectfully

submit this Sentencing Memorandum regarding Steven Minella.

I.      **INTRODUCTION**

Steven Minella had been a member of the International Union of Operating

Engineers Local 324 for nine years before he was appointed a business agent for

Local 324 in 2007.  By 2008, he had quickly gained the trust of his union brethren;

they elected him their recording-corresponding secretary.  And by 2009, Minella

was Local 324's President.  However, during 2008 through 2012, while serving in

those various capacities, Minella would breach the trust afforded him by the

1

18,000 Local 324 union members and become beholden to Hamilton, carrying out

and enforcing Hamilton's extortionate scheme for Hamilton's personal gain, all to

the detriment of the union and its members who had entrusted Minella (and

Hamilton) to put their best interests first. In the end, Minella would betray his

union brothers even more by helping Hamilton conceal his crimes.

II.     **ARGUMENT**

### A. The Nature and Circumstances of Hart's Crime (18 U.S.C. § 3553(a)(1))

### 1.  Minella's Duty to Serve the Members of Local 324

After having worked in the field as a member of Local 324 for

approximately seven years, Minella became a business agent for Local 324, in

2007.  Although appointed by Hamilton to this position, Local 324 employs the

business manager and the staff of business agents and support personnel to run the

affairs of the union.   As a business agent, Minella shared Hamilton's obligation to

the Local 324 membership and by extension was  "directly responsible to the

membership" of Local 324, and "authorized and empowered to direct and conduct

the business affairs of the Local Union, at all times representing the *entire*

membership."  Art. XXIV, Section 1 Bylaws of International Union of Operating

Engineers Local Union 324 (emphasis added).

Minella would later serve in the next highest office after the business

manager. In 2009, Minella became the union's President.  As such, Minella owed

an even greater duty to Local 324 members, but over the course of Minella's

service to the union, between 2008 and 2012, Minella would forget for whom he

served. Instead of fulfilling his duty as an elected officer and representative of the

members of Local 324, Minella would betray the trust of the Local 324 members

and spiral into the web of extortion perpetrated by John Hamilton on union

business agents and union staff.

### 2.  Minella had Actual Knowledge of Hamilton's Extortionate Scheme

Between 2008 and 2012, Hamilton forced business agents to pay $100 per

week into the Hamilton Slate Fund, purportedly for the purpose of financing the

campaign for Hamilton and the slate of candidates running with him during union

elections.  Business managers who served before Hamilton also maintained similar

funds for this purpose.  But, by all accounts, the campaign fund maintained by the

prior business manager, was voluntary, and the business agents paid a mere $25

per week into it.  When Hamilton became business manager, he steadily increased

the amount of the contributions until by 2006, union business agents were paying

$100 per week or $5,200 yearly into Hamilton's slate fund.  The compulsory

nature of the contributions and the fact that Hamilton used significant portions of

the slate funds for his own personal enrichment, not only made the contributions

into the slate fund different from those in the past, but also made them unlawful.

Minella and all the business agents knew that if they refused to pay into the fund

Hamilton would fire them, leaving them without the ability to support themselves and their families.  Minella also knew that Hamilton's conduct of forcing union agents to contribute to the slate fund violated the law. With full knowledge of the unlawful nature of Hamilton's actions, Minella oftentimes was the conduit through which Hamilton exerted his fear and intimidation to force business agents to pay into the slate fund.  By the end of the conspiracy, Minella would have helped Hamilton coerce and intimidate union business agents into each paying tens of thousands of dollars of their hard earned income, salaries supported with union funds, into the fund from which both Hamilton and Minella inappropriately and unlawfully personally benefitted.

### 3.  Minella Furthered Hamilton's Extortionate Scheme

Minella assisted Hamilton in making Hamilton's unlawful intentions and demands clear to the union business agents.  Minella became known by union members as one of Hamilton's "right hand men;" "henchmen;" "lackeys;" and, "part of Hamilton's inner circle," along with union Financial Secretary and co-defendant David Hart.  In several ways, Minella conspired with Hamilton to further Hamilton's extortionate scheme and further the abuse of power Hamilton wielded on union business agents and other union personnel.

Minella knew first hand that business agents had no choice but to pay into the fund or lose their jobs.  He himself made involuntary payments into the same

fund in order to maintain his employment and he was fully aware that Hamilton's demands violated Michigan law. The Michigan Payment of Wages and Fringe Benefits Act, Section 408.477(1) prohibits an employer from deducting "from the wages of an employee, directly or indirectly, any amount including an employee contribution to a separate segregated fund . . . without the full, free and written consent of the employee, obtained without intimidation or fear of discharge for refusal to permit the deduction." Michigan law also prohibits an "employer, agent or representative of an employer, or other person having authority from the employer to hire, employ, or direct the services of other persons in employment of the employer shall not demand or receive, directly or indirectly from an employee, a fee, gift, tip, gratuity, or other remuneration or consideration, as a condition of employment or continuation of employment." M.C.L.A. § 408.478.

However, in order to conceal his unlawful conduct, Hamilton devised an artifice to circumvent Michigan law—The Wage Authorization form that union business agents were forced to sign and falsely claim that their $5,200 yearly payments into the slate fund were voluntary. Knowing that union business agents' contributions were, in fact, involuntary, Minella was fully aware that Hamilton was perpetrating a fraud by requiring union business agents to sign this authorization form in order to both obtain a job as a business agent and to keep it and that this forceful conduct amounted to extortion.

Minella also participated in one of Hamilton's most aggressive demonstrations of instilling fear and intimidation in the union business agents who paid into the fund—the firing of Kenneth Dombrow, the union's auditor, after he complained to some secretaries about making the slate fund payments.  In September 2010, Dombrow was serving as the elected auditor of Local 324, and he was employed as a business agent. Dombrow had complained to three secretaries about being forced to make the weekly $100 payments into the slate fund.  One of those secretaries told Hart.  After hearing this, Hart confirmed Dombrow's statements with the other secretaries and reported Dombrow's complaints to Hamilton. Predictably, and as a result of Hart's action, when Hamilton received word that Dombrow had complained about the slate fund payments, Hamilton fired Dombrow.  At Hamilton's behest, Minella contacted Dombrow and ordered him to report to Hamilton's office so that Hamilton could fire Dombrow.  Minella enforced Hamilton's directive by demanding that Dombrow leave a funeral that Minella knew Dombrow was attending and report to the union office immediately. Hamilton apparently wanted to ensure that his firing of Dombrow from the union sent a sufficiently strong, clear message to union business agents. Hamilton bolstered his position by attempting to blackball Dombrow from future employment.  Once Hamilton learned that Dombrow had secured subsequent employment with a Local 324 contractor, Minella would again follow Hamilton's

directive to use any and all efforts to get Dombrow fired.  Minella contacted that

contractor inquiring about whether Dombrow had the proper training for the job,

and instructed the contractor to terminate Dombrow if he didn't.  Minella did this

all in an effort to carry out Hamilton's message and while knowing that Hamilton

was interfering with Dombrow's ability to support himself and his family, and that

Hamilton's action was done in retaliation for Dombrow's complaints about

contributing to the slate fund. Minella's actions helped Hamilton further solidify

Hamilton's message to union business agents that failure to contribute to the fund,

or voicing any opposition about contributing into the fund, would cost you your

job at the union and elsewhere.  And those efforts worked because business agents

who heard about the Hamilton's efforts to have Dombrow fired from his new

employment, feared similar retaliation if they objected to the slate fund payments.

Rather than have Hamilton do his own dirty work, Minella demonstrated his

allegiance to Hamilton and Hamilton's message over what should have been his

faithfulness to the members of Local 324 who he had been elected to serve.

### 4. Minella Personally Benefitted from Hamilton's Extortionate Scheme

In addition to aiding Hamilton's efforts to exert fear and intimidation to

force union business agents to pay into the slate fund, Minella also personally

benefitted from Hamilton's misuse of union funds.  Minella knew that Hamilton

used the slate fund money as his own because Minella himself enjoyed the

majority of the expensive meals and liquor that Hamilton used slated funds to pay for as part of what became known as the "Lunch Program." Minella along with Hamilton used tens of thousands of dollars in union funds to pay for meals and liquor on a weekly basis at high-end restaurants in southeast Michigan, during which no union business was conducted or even discussed.  Minella was also regularly with Hamilton at the various sports events and at the Detroit Athletic Club where exorbitant expenses for food, liquor and other expenses were improperly charged to the slate fund and union accounts. Minella also supported Hamilton's improper use of the slate fund monies to provide a $5,000 wedding gift for Hamilton's daughter and for drop phones that Hamilton used to communicate with his paramours. And Minella's very own family benefitted from the improper use of slate fund monies even more directly.  Approximately, $6,000 of funds from the slate fund were improperly used towards Minella's brother-in-law's funeral. Although altruistic, this was not the purpose for which the slate funds were supposed to be used; $6,000 is an excessive amount of funds to be used for this improper purpose; and, no other union business agents who contributed to the fund enjoyed this privileged use of slate fund money.

Minella's facilitation of Hamilton's abuse of power didn't end with Hamilton's exploitation of slate funds. As noted above, union funds were also misused to pay for the Lunch Program and other extravagances.  In addition, when

Hamilton wanted fancy custom rims and tires for his luxury Cadillac DTS

provided to Hamilton by Local 324, Minella, as president approved the nearly

$3,000 expense, knowing that there was no union benefit served by the purchase

and that it was an improper use of union funds. As the next highest ranking officer

under the business manager, Minella had a duty to preserve the union's assets, and

he neglected his duty to the Local 324 membership by allowing this inappropriate

expenditure for Hamilton's sole personal enjoyment.

In the end, once Hamilton's dictatorial reign ended after Hamilton lost the

election in 2012, Minella would support Hamilton's final criminal scheme. As

Hamilton continued to use the slate fund for his personal gain in the face of defeat,

Minella, too, would join him in the abuse, despite the fact that at the time Minella

was still the President of Local 324.

On a Saturday evening, in August 2012, Hamilton, Minella and Hart met at

Local 324's headquarters.  Hart contacted Chief Financial Officer, Michael

Pankiewicz to locate the slate fund checkbook and later removed it from the CFO's

cabinet in his office.  Under Hamilton's direction, Minella (and Hart) wrote a

series of seventeen checks from the slate fund checkbook in order to empty out the

Hamilton Slate Fund bank account of the $145,000 remaining. PSR ¶ 11.  Minella

received four checks totaling $37,000.000. *Id.*  Even after Hamilton had been

stripped of his power, Minella continued to betray the trust of his union brethren

and assist Hamilton in depriving union business agents' of their rightful claim to the funds remaining in the slate fund following Hamilton's defeat.

Over the course of the conspiracy, Minella personally benefitted from Hamilton's misuse of the slate fund and union monies through his association and facilitation of Hamilton's criminal scheme in significant ways.  And Minella, himself, ultimately improperly converted slate fund money to his own use by participating in writing the series of checks to himself from the slate fund account. However, as part of the plea agreement, Minella has agreed to pay $37,000 in restitution for his part in depleting the slate fund account, so that the funds may be returned to their rightful owner, the Local 324 union.

### 5.  <u>Minella took Affirmative Steps to Assist Hamilton in Concealing His Extortion Through Structuring</u>

When Hamilton lost the election, Minella continued his misguided devotion to Hamilton and engaged in further dereliction of his duty to the union by helping Hamilton conceal Hamilton's final act of extortion and, in the process, advancing yet another one of Hamilton's crimes. On that Saturday evening in August 2012 when Hamilton decided to raid the remaining funds in the slate fund account, Minella and Hart wrote the seventeen checks in amounts less than $10,000 in order to avoid generating a Currency Transaction Report at the bank.  PSR ¶ 11.  Minella knew what he was doing was wrong because Hamilton told Minella (and Hart) to

write the checks in those amounts in order to avoid "red flags" at the bank. Minella

further concealed Hamilton's crime by not revealing to any of the other business

agents who had contributed to the slate fund; nor the CFO responsible for handling

the slate fund account, or anyone else, including law enforcement, that they had

divvied up the funds in the slate fund account for their own personal gain. In this

way, Minella helped Hamilton avoid not only law enforcement scrutiny of his

criminal scheme, but also scrutiny by his fellow union brethren who he was elected

to serve.

## B. The Seriousness of Minella's Crimes, Just Punishment, and Respect for the Law (18 U.S.C. § 3553(a)(2)(A))

Minella's crime is particularly serious because he not only facilitated

Hamilton's misuse of slate funds and union funds, he did so in violation of his duty

to Local 324 union members as one of their highest elected officers.  Minella also

personally benefitted significantly from Hamilton's abuse of power at the expense

of those who Minella was entrusted to serve.  Knowing that Hamilton was using

union funds to personally enrich himself, as a business agent of the union and an

elected officer of the union, Minella breached the trust of Local 324 union

members by advancing Hamilton's extortionate scheme and further by personally

enriching himself and concealing Hamilton's crimes.  Local 324 union members

were entitled to loyalty from their officers, the type of loyalty that put the best

interest of the union members as a whole first. Minella's undeniable betrayal of his

duty to the members of Local 324 in order to satisfy the illegal objectives of one

individual, one who was even more entrusted with protecting and advancing the

best interest of the union should be accounted for in Minella's sentence.

### C. Deterring the Criminal Conduct of Others
   (18 U.S.C. § 3553(a)(2)(B))

One of the victims most seriously affected by Hamilton's illegal actions in

this case, Kenneth Dombrow, stated during Hamilton's sentencing, "with

responsibility comes accountability," and "no one man controls."   And nothing

could be more true. Unions are formed to protect and further the rights and

interests of its members, not the personal interests and objectives of one individual.

Minella lost sight of this fundamental tenet of union membership and

representation, and Local 324 suffered as a result. This Court should send a strong

message to those entrusted to handle union business and protect and advance the

best interest of the union who, rather than faithfully carrying out their

responsibility to union members, elect instead to personally enrich themselves and

or assist or advance the interest of anyone with that objective, through coercive

measures or other illegal methods, will be held responsible for their crimes.

**D. Protecting the Public from Further Crimes by Minella**
   **(18 U.S.C. § 3553 (A)(2)(C))**

Further crimes by Minella are unlikely.  Minella has accepted responsibility

for his crime; shown extreme remorse for his criminal conduct; and provided

significant cooperation in this case. In addition, given this conviction, it is also

unlikely that Minella will be put in a position of trust to commit additional crimes

in the future.

### III.   SENTENCING GUIDELINE CALCULATIONS

#### A.   Statutory Maximum Sentence

As set forth in Title 18, United States Code, Section 4, the maximum

sentence that may be imposed on Minella is 3 years.  The maximum fine is

$250,000.

#### B.   Base Offense Level and Specific Offense Characteristics

##### 1.  Base Offense Level

Minella's adjusted offense level, including the sole specific offense

characteristic based on the amount of loss in this case, was calculated at 14. The

probation department agrees that the appropriate adjusted offense level in this case

is 14. (PSIR, ¶¶ 19, 23).  Because Minella has no prior criminal convictions, his

criminal history category is I.  The resultant guideline range calculated by the

parties is 10-16 months.  The probation department also concurs with the parties'

calculation of the sentencing guideline range in the plea agreement. (PSR, ¶ 47).

### 2.   2016 Amendment to U.S.S.G. § 2B1.1

In calculating Minella's sentencing guidelines, the parties relied on the 2015

Guidelines Manual. However, after Minella entered his guilty plea, the United

States Sentencing Commission amended § 2B1.1 of the sentencing guidelines,

which applies in this case and was used to calculate Minella's original sentencing

guideline range.  Under the 2015 Guidelines Manuel there is a 14 point level

increase to the offense level for an amount of loss more than $250,000 but less

than $550,000, under § 2B1.1(b)(1)(G), the guideline section applicable to this

case.  However, in 2016, the United States Sentencing Commission reduced the

point level increases under § 2B1.1 of the sentencing guidelines by two levels,

thereby reducing § 2B1.1(b)(1)(G), the section that applies here, from a 14 level

increase to a 12 level increase.

Pursuant to the policy statement in U.S.S.G. §1.B1.11, which provides that

"the court shall use the Guidelines Manual in effect on the date that the defendant

is sentenced,"  Minella is entitled to a two level reduction to his offense level

because the 2016 Guidelines Manuel is in effect and will govern on the date of

Minella's sentencing.  As a result, Minella's total offense level is reduced from an

offense level of 14 to an offense level of 12.  With a total offense level of 12 and

14

criminal history category of I, along with the two level reduction for acceptance of

responsibility, the applicable sentencing guideline range is now 6-12 months. The

parties agree that 6 to 12 months is the applicable guideline range in this case and

request that the Court amend the presentence report to reflect this change.

## IV.   <u>CONCLUSION</u>

Minella committed serious criminal conduct over the course of a number of

years by putting the sole interest of Hamilton before the best interest of the union

members of Local 324 who Minella was entrusted to serve.  This conduct ranged

from Minella's participation in firing Kenneth Dombrow and the other efforts to

blackball Dombrow and Minella's personal enjoyment in the weekly Lunch

Program to his illegal taking and concealment of the ill-gotten funds from the slate

fund following Hamilton's defeat in the election. Balanced against Minella's

crimes and misconduct is his acceptance of responsibility, significant remorse and

his cooperation in this case. Minella's sentence should reflect the serious crime he

committed, while at the same time recognizing the very substantial efforts he has

made to correct his wrongs.  For those efforts, Minella should receive appropriate

credit and due consideration of the Court.  The government is confident that the

Court will impose an appropriate sentence.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/DAVID A. GARDEY
s/DAWN N. ISON
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, Michigan  48226-3211
dawn.ison@usdoj.gov
(313) 226-9567

Dated:  April 18, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on <u>April 18, 2018</u>, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system, which will send

notification of such filings to the following:


*Brian M. Legghio, Esq.*
*Attorney for Steven Minella*


s/DAVID A. GARDEY
s/DAWN N. ISON
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, Michigan  48226-3211
dawn.ison@usdoj.gov
(313) 226-9567

Dated: April 18, 2018